On August 25, 1942, the plaintiff shipped a carload of rice bran from its mill at Kaplan, Louisiana, over the Texas New Orleans Railroad Company, consigned to Mayronne Lumber Supply Co., Marrero, Louisiana. The shipment did not arrive at destination until five o'clock in the afternoon of August 31, 1942 and upon the car being opened the bran was found to be in a damaged condition and shipment was rejected *Page 43 
by the consignee. The shipper was notified and as it contended that the bran had been delivered to it in good and sound merchantable condition, it advised the railroad company that it would hold it responsible for the loss which had been occasioned and that it would file claim for the invoice value which, it is not disputed, was $876.00 The railroad company refused to pay the claim and this suit was accordingly instituted against it to recover judgment for that amount.
In the petition shipment is alleged to have been made to the railroad company for immediate transportation and delivery to the consignee, and proper averment is made of the payment of freight and switching charges. The value of the shipment is stated and it is alleged also that demand was made for the damage which occurred while in transit and payment refused.
For answer, the defendant admits the shipment as alleged and that demand was made for the damage claimed but it otherwise denies all other averments made. Further answering, the defendant states that upon receiving the car on August 25, 1942, it promptly placed the same in a train which left Kaplan that afternoon at 1:25; that the car was handled with due and proper care and moved with due diligence and dispatch to the consignee's siding where it was placed on August 31, 1942 and proper notice given of its arrival. It denies any negligence in handling the shipment, avers that the car in which the bran was loaded was properly inspected and found suitable for the commodity and to be in first class condition. On information and belief it sets out the condition of the bran upon delivery and alleges that the damage done to the shipment was due to the inherent nature of the commodity; that the bran contained an excessive amount of moisture which caused it to heat and sweat upon being closed in the car during the warm weather that prevailed at the time; that the excessive moisture in the bran was due to the fact that it had not been kiln dried or was improperly kiln dried and was loaded in the car shortly after having been milled, as well as for other reasons inherent in the nature of the commodity.
Defendant then alleges that upon refusal of the consignee to accept the shipment and also the refusal of the consignor likewise to accept the same and because of the perishable nature of the commodity, after due notice given to the plaintiff, the bran was sold at public auction for the account of whom it may concern and the net proceeds of the sale amounting to the sum of $17.65 was offered to the plaintiff prior to the institution of this suit and that it now tenders to the plaintiff the said sum, together with legal interest, and costs accrued to this time. It deposited the amount of $23.45 in the registry of the court.
In the alternative defendant avers that in the event it should be found that there was an unusual delay in the movement of the shipment from Kaplan to Marrero, Louisiana, then, and in that event it pleads that the delay was due to the war emergency then existing; that the unprecedented amount of business which it was required to handle in connection with the national defense, the necessity of handling traffic which greatly increased the switching of cars under extreme difficulty and the necessity of concentrating its facilities on the traffic necessary and important to the war effort made the delay unavoidable.
After trial in the lower court there was judgment in the favor of defendant rejecting the plaintiff's demand. As appears from the transcript of the minutes of court the trial judge dictated a short statement in the record which is to the effect that he rejected plaintiff's demand on the ground that the bran shown to have been spoiled was damaged and spoiled as the result of the presence of excessive moisture in it when it was loaded and that the evidence showed complete freedom of negligence on the part of the railroad company in handling the shipment. Plaintiff has taken this appeal.
[1] Whatever law there is involved in the case does not seem to be controverted. The shipment was an intrastate shipment and all legal questions involved have to be determined under the law of Louisiana pertinent thereto. That is a proposition which seems to be recognized by the jurisprudence of this State, noticeably in the *Page 44 
case of Dejean v. Louisiana Western Railroad Co., 167 La. 111,118 So. 822, and it is not disputed by counsel for the defendant. The liability, if any, of the railroad company, the common carrier which handled the shipment in this case, is specifically set out in Art. 2754 of the Civil Code. That Article provides that "carriers and waterman (watermen) are liable for the loss or damage of the things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events."
[2, 3] The obvious inference to be drawn from this provision is that the moment the carrier accepts a shipment for transportation the burden of proof, in order to exonerate itself from liability for any damage occasioned to the shipment while in transit, is placed upon it and it will be held liable unless in carrying that burden it can show that the loss or damage was occasioned by some accidental or uncontrollable event which, as interpreted in the case of Dejean above cited is the equivalent of a fortuitous event or a "force majeure." As a matter of fact in the French text of the same Article which is Art. 2725 of the Code of 1825 the term "force majeure" is the one used and although a hidden defect or inherent vice in the commodity which may cause its loss or damage in transit may well be considered an uncontrollable event or a "force majeure," still, under the terms of the Article of the Civil Code itself it is up to the carrier to make proof of that fact when it is urged as a defense to an action as it is being used in this case.
In Lehman, Stern Co. v. Morgan's Louisiana T. R. S. S. Co., 115 La. 1, 38 So. 873, 875, 70 L.R.A. 562, 112 Am. St.Rep. 259, 5 Ann.Cas. 818, the court stated: "The carrier must prove the precise cause of the loss. It will not suffice to prove merely due diligence, but the carrier must prove, moreover, that the accident was occasioned by a fortuitous event, or by irresistible force, or by a defect of the thing itself, or by a fault of the shipper. Fuzier-Herman, Code Civil, Vol. 4, p. 419, No. 1." (Italics ours)
Our Supreme Court seems to have recognized that Article 2754
of the Civil Code imposes a rather harsh duty upon the carrier for in the case of McGinn v. New Orleans Railway Light Co.,118 La. 811, at page 820 of the decision, 43 So. 450, at page 453, 13 L.R.A., N.S., 601, it refers to the "rigidity of the rule as to the burden of proof in cases of this character." In assigning a reason why the rule is different when applied to the transportation of "things" instead of "persons," it states that "in the one the objects injured are inanimate, and can have nothing whatever to do with the injury they receive. Nothing intervenes to break the responsibility of the carrier for their safety. In the other the volition of the persons transported, their infirmities, mental and bodily, as well as other matters, personal to themselves, may affect the situation — matters of which the carrier could rarely have knowledge and over which it has no power of control."
In the present case therefore when the defendant urged the inherent defect in the rice bran because of excessive moisture in its milling or processing, as the "uncontrollable event" which exonerates it from liability, it undertook the task to support that defense by competent proof and to a legal certainty. In effect its defense is that this shipment of rice bran had not been sufficiently dried in the process of its manufacture and preparation for shipment and was left with too much moisture to withstand the temperature incidental to being transported in a freight car.
To support that defense the defendant relied principally on the testimony of two expert witnesses, one Mr. A.P. Kerr, Chief Chemist for the Louisiana State Department of Agriculture and also chief chemist of the Feed Fertilizer Department of Louisiana State University Experiment Station, and Mr. Karl Adler of the Adler Export Co. of New Orleans, whose firm has been engaged in the export business for 40 years, during which time it has handled many cars of rice bran. These experts did not testify but each prepared a written statement which was placed in the transcript and under an agreement of *Page 45 
counsel what is contained in the statement of each, is to be considered as what he would have testified had he appeared on the witness stand.
Mr. Kerr never did see the shipment of bran in question and Mr. Adler saw it on September 18, 1942, over two weeks after it had been delivered to the consignee at Marrero. The statement of each as to the cause of the damaged condition of the bran is therefore purely opinion testimony. Mr. Kerr states that good rice bran should have a moisture content of below ten per cent and that under these conditions it will not spoil on shipping and that if it spoils after being loaded in a railroad freight box car for seven days, or is stored anywhere else for seven days, there is evidence of too much moisture in the bran to start with. Then he goes on to add that the spoilage is brought about either by too high a moisture or an increase in the free fatty acid in the oils. There is no contention in this case that spoilage was caused from an increase of acids or oils, and he attributes the spoilage to the presence of too high a moisture when the bran was loaded "unless" he adds, "it got wet in transit."
Adler, as stated before, examined the bran more than two weeks after it had been delivered and nearly a month after it had been shipped, at which time he says he found it "sweated, caked and spoiled because of the fact that excess moisture had been left in the bran," and "if" he adds, "the said bran had been properly kiln dried and the moisture removed, the bran would not have sweated and spoiled."
Now with regard to the processing of this bran we find this testimony in the record:
Mr. C.J. Montgomery who is manager of the Kaplan Rice Mill described the process by which bran is kiln dried in their mill and he states that the shipment in question was kiln dried. He describes the method by saying that it is passed through a kiln about 14 feet long. The bran enters at one end and slopes in the lower end, after which it drops into a lower kiln of the same length, giving it a 28 foot flow, and in its passage through the kilns it is constantly agitated by revolving steam coils and at the same time heated air is drawn through it. The kiln through which the bran passes is a different kiln from that through which the rice is dried. He states that the moisture content at the mill is tested through a TagHetpen-Star Moisture Meter. He admits that he did not examine the particular lot of bran involved in this shipment but does state, in effect, that all their bran goes through the same process and that the operation is uniform throughout.
Mr. P.H. Gilbert who is manager of the plaintiff's traffic department testified that he was the one who requisitioned two cars from the railroad company for shipment of two lots of bran including the one we are here concerned with. The requisition was made August 24, 1942, for the load of bran to be shipped immediately. The two cars were spotted and loaded at the same time with bran from out of the same stock. One was the one consigned to Marrero and the other was consigned to Western Grain Co., Birmingham, Alabama. He examined the bran consigned in both shipments and found it very good. He makes an inspection of all the bran in the warehouse every morning and sees that all bags of bran are in good shape for shipment. At the time this shipment was made there were about 2600 bags in the warehouse which had been there from 24 to 30 hours. In making his inspection each morning he does not open the bags which, he says, is not necessary to find out if the bran is in sound condition.
Mr. Ophe Touchet who has been the miller at the Kaplan Rice Mill for five years testified that after the rice is milled all the bran goes to the dryer before being put in bags. All bran at the mill is kiln dried and so was this one. He knows that because it is his duty to see that all bran passes through the dry kiln which he operates himself. It is all run through a testing machine and it is all over ten per cent dry.
J.O. Broussard, Jr., sales manager for the mill, stated that he knew the contents of this shipment and that it was thoroughly dry, good and in sound merchantable condition. *Page 46 
He examined it himself. On being advised that it had been rejected by the consignee there was nothing that he could do to minimize the loss so he also rejected it and advised the railroad company that the damage was undoubtedly due to its fault and that he was filing claim for the invoice value. He received no complaint on the other shipment that was made that same day and which went to Birmingham. He contends, in answer to questions under cross-examination, that the railroad was at fault because the bran was thoroughly kiln dried, they had never had any complaint previous to this, nor since, and that the bran when inspected by state inspectors wherever it is shipped, was always favorably certified. He attributes the cause of the damage to the delay along the river territory where there is a humid atmosphere and also the possibility of moisture developing from the car material. This witness says that there is not a morning that he does not go through the bran room to make an inspection, walking in and out of the stacks feeling about every twentieth bag to find out if some of the bran has not become hot or caked and on no morning since he has worked there has he found any in that condition. He says it is not necessary to open the bag to make the inspection because if the bran is rancid it will smell and if it is hot or caked it can be felt. He is sure he made this same inspection on August 24 and states also that they always loaded the oldest bran in the warehouse first whenever they shipped.
[4] With all this testimony before it we believe that it is difficult for a court to hold that the bran included in this shipment was not properly kiln dried. True it is that each particular bag in the shipment was not identified as having passed through the kiln on a certain day and that each was not specifically inspected but plaintiff could hardly be expected to produce evidence as strong as that and when it has shown, as it did, that what was done with regard to the bran in this shipment is what is done with respect to all the bran that is processed in its mill, that it has a uniform method of operation and that all bran is tested and dried below ten per cent, which is the requirement of one of defendant's expert witnesses in order to make it safe for shipment, then we think that it has sufficiently rebutted what proof the defendant in this case offered to show that it was not properly kiln dried. An added circumstance which, in our opinion, tends to show that it was, lies in the fact that the carload shipped from the same lot of bran, on the same day, to Birmingham and which was on the road a day longer than this shipment, reached its destination in good condition.
Counsel for defendant urges upon the court that the records of the meter tests and the certificates of inspection from the state inspectors which are referred to, were not produced. There was no objection however to the oral testimony regarding these matters and neither did counsel call for the production of these records which they had a right to do if they cared to see them and were available.
Something is said too in the testimony and in argument about this bran having come from rice that was milled in the month of August, which, it is generally known, contains more moisture than later rice, but the testimony of Mr. Montgomery shows that if there is more moisture in the rice at any one time than another, the rice itself is more thoroughly dried in order to take the moisture out and the bran is run through the same drying process.
Our attention is also directed to the statement of the witness W.C. Hunter, Claim Clerk of the defendant railroad company who was present when the car in which the bran had been shipped was opened on Sept. 9, 1942 and in which it is made to appear that J.A. Fortier, of Fortier Brown, brokers of New Orleans, who represented plaintiff, stated in his presence and that of other parties, "you know, Mr. Hunter, this bran is not kiln dried." The statement of this witness, like that of so many others, was accepted as proof of what he would have testified on the witness stand. Mr. Fortier did not testify either but a letter written by him to the plaintiff on June 2, 1945, was placed in the record and, by agreement, it is also to be considered as what he would have testified *Page 47 
to. In that letter he goes on to say that in his opinion, the damage to the bran was caused from the extremely long delay of the car in transit and to climatic conditions prevailing at that time. Further he states that he, and everyone else who has had dealings with the plaintiff knows that its reputation of being a reliable shipper is beyond reproach and "we know that every sack of rice bran that comes out of your mill is thoroughly kiln dried." In the closing paragraph of the letter he states that the bran was inspected by himself and Mr. Hunter and that he expressed his opinion accordingly, meaning according to the contents of his letter, to Mr. Hunter, at that time. Counsel for defendant state that Hunter's testimony of what Fortier had stated to him is not denied but if we consider Fortier's letter in the same light as the statement given by Hunter then we find in it a most positive denial.
We come now to consider the testimony of two of the witnesses of the defendant that was given in open court.
The first is that of Mr. W.F. Halphin, defendant's local agent at Kaplan. He recalls the shipment, says that he signed the bill of lading at 12:01 August 25 and the train with these two cars left Kaplan at 1:25. He is familiar with the type of car used for bran shipment and when asked the specific question whether the car furnished in this case was considered to be first class, he says: "I don't say first class but it was suitable for that which was loaded in it." He states that it is the first time in his experience that bran shipped from the Kaplan Rice Mill was rejected by the consignee. This witness does not know if there is any difference in bran loaded in a car that remains stationary at one point and bran that is shipped in a car which is in continual travel.
The other witness was Mr. H.A. Roussel who was car inspector for the defendant at the time of this shipment. He inspected this car and was asked if it was approved for the loading of rice bran. His answer is: "It was classed as a clean rice car." Then when asked whether it was the same type and same construction of car as those usually used for transportation of rice bran he answers: "Well, I would say no on that because we have steel cars and we have wooden cars. They are different types but both of them are furnished for that."
[5] In connection with this testimony let us consider the next and very important matter of the length of time this shipment was in transit and the possibility, now that we have seen that the car was not a "first class" car and that it was classed as a clean rice car instead of a rice bran car, of it having become damaged because of the delay in delivery. We must bear in mind that it is not the duty of the plaintiff but that of the defendant to show that that may not have been either the cause or one of the causes of the bran spoiling.
The car left Kaplan at 1:25 p.m. on Aug. 25th and arrived at Marrero at 5:00 p.m. August 31st. Defendant has inserted in the record a complete transcript of the movement of the trains which handled it. To begin with we see the route covered a distance of 149.3 miles. Taking over six days to cover that distance is, to say the least, rather slow travel even for a freight train. Of course, the delay is sought to be excused by the reasons set out in the alternative plea but even then, in checking through this transcript of the train schedule, it seems as though some of it was almost unnecessary. For instance the car arrived in New Iberia at 4:20 in the afternoon of the same day it was shipped and it laid over at that point until 7:50 the next morning, a standing time of 15 hours and 30 minutes. It is true that there are seven entries made in the transcript of matters that were apparently urgent and had to be taken care of during that interval but even then it looks as though they could have been dispatched with a bit more readiness. The rest of the trip, as far as Avondale, although a bit slow, having taken almost two full days, might be in line with the usual movement of this kind of freight train during the emergency. We note however that on its arrival there, it is marked 61 hours and 30 minutes late, which looks most unreasonable.
In this connection reference might also be made to a letter written by the consignee *Page 48 
of this shipment, Mayronne Lumber Supply Co., Inc., to the plaintiff in which, after commending the plaintiff on the quality of its bran, they state with regard to delivery as follows: "Delivery has always been made to us in about two days after car leaves the mill."
At Avondale the car had to be delivered to the Texas 
Pacific Railroad Company and according to the records, it took 46 hours and 35 minutes to do this. Allowing the greatest reasonable latitude to the emergency existing, we cannot help but feel that this shipment did not receive fair treatment at the hands of the railroad company. It is not disputed that there is more humidity next to the river in the yards of the defendant company at Avondale and that there were some thunder-showers in the vicinity during those hot days of August when the car was laid up there. Is it unreasonable to presume therefore that all of this may not have been conducive to some moisture being produced in the bran? Mr. Kerr, the expert witness, testified as we must remember that the cause of the spoilage was excess moisture when the bran was milled, "unless it be shown that it got wet in transit."
With regard to the alternative plea made by the defendant, should it be held that the delay was the cause of the spoiling of the bran, we believe that counsel for plaintiff has made the proper answer when he states that the defendant was well aware of the condition that existed and of the emergency that had been brought about in the transportation facilities of the country, and all of this should have been taken into consideration by it in accepting for shipment this commodity which, it must have known, was perishable, since it now contends that its inherent nature was the cause of the loss and damage.
[6] After reviewing all the evidence in the case and applying the law as we think it should, we find ourselves constrained to disagree with the learned trial judge and it becomes necessary therefore for us to reverse the judgment appealed from.
For the reasons stated it is therefore ordered, adjudged and decreed that the judgment of the lower court be and the same is hereby reversed, annulled and set aside and it is further ordered that there be judgment in favor of the plaintiff, Kaplan Rice Mill, Inc. and against the defendant, Texas New Orleans Railroad Co., in the full and entire sum of $876, with legal interest from September 16, 1942, until paid, together with all costs of these proceedings. *Page 128